405 So.2d 228 (1981)
James H. SCOTT, Sheriff of Jefferson County, and Lillian C. Morgan, Sheriff's Administratrix, In the matter of Citations for Contempt, Petitioners,
v.
Judge Charles ANDERSON, County Judge in and for Jefferson County, Florida, Respondent.
No. AD-219.
District Court of Appeal of Florida, First District.
October 14, 1981.
*229 Barry Richard of Roberts, Miller, Baggett, LaFace, Richard & Wiser, Tallahassee, for petitioners.
Ben H. Ervin, Tallahassee, for respondent.
Julius F. Parker, Jr., of Madigan, Parker, Gatlin, Swedmark & Skelding, Tallahassee, for Florida Sheriffs Association, amicus curiae.
LARRY G. SMITH, Judge.
Petitioners[1] seek certiorari review of a decision of the Circuit Court of Jefferson County, sitting in its appellate capacity, affirming petitioners' adjudication of contempt by the respondent County Judge of Jefferson County. Petitioners raise several points in support of their contention that the decision of the Circuit Court departed from the essential requirements of law, including their contentions that the remarks were not contemptuous but were privileged comments protected by the First Amendment. We find no departure from the essential requirements of law in the Circuit Court's affirmance on these points. However, we agree with petitioners' contention that by Judge Anderson's failure to disqualify himself from presiding over the hearing on his citation for contempt petitioners' due process rights were violated. The decision of the Circuit Court is quashed with directions to enter an order reversing the adjudication of contempt, and remanding for redetermination of the contempt citation before a disinterested judge.
The essential facts as disclosed by the petition and the record must be stated in some detail. On January 14, 1981, Jefferson County Court Judge Charles Anderson presided over a charge of driving while under the influence of alcohol against Anthony Green. Green was a statutory first offender, not having been convicted on similar charges during the previous three years. The judge was inclined to impose a fine and a suspended sentence, with no incarceration. However, after being informed by Green's employer that he believed time in jail would "do Green some good," the judge sentenced Green to three days in jail.[2] After the Green case was disposed of, Judge Anderson took up another case, and then announced a recess, although he remained at the bench. During the recess petitioner Morgan returned to the Sheriff's Office in accordance with her normal procedure. While there she mentioned the disposition of the Green case to petitioner Scott. Sheriff Scott asked Mrs. Morgan to return to the courtroom and state to the judge that it be put on record that Green was given three days in jail on his first offense because his boss asked that he be given jail time while second, third and fourth offenders were not given jail sentences. Mrs. Morgan returned to the courtroom *230 and made a statement to Judge Anderson essentially as follows:[3]
Sheriff Scott asked that it be put on record that Judge Anderson gave a first offender time in jail when in the past he did not even give jail time to repeat offenders, because his boss man asked that he be given jail time.
Immediately following this statement Judge Anderson called the court back into session and made the following statement:
THE COURT: I've just been informed that the Sheriff said that he wanted it as a matter of record that this judge gave jail time to a first offender because of the complaint of a citizen witness, who is also his employer. For the record, I am informing Mrs. Morgan and the Sheriff and the press that as long as I'm County Judge of Jefferson County, that I am the judge and not Sheriff Scott. That's a matter of record. I want no administrative assistants questioning my discretion or no sheriff.
The judge then called a second recess so, he stated, "I could regain my composure."[4] After the recess, the judge undertook to state for the record the events that had just occurred, and to confront the sheriff, who had been summoned to the courtroom at the judge's request, and Mrs. Morgan with respect to her statement. The judge expressed his displeasure concerning the incident and engaged in a colloquy with both petitioners. As to Mrs. Morgan, the judge stated that although he was sorely tempted to issue a citation for contempt, he would restrain himself, with the admonition that if such an occurrence should happen in the future a citation for contempt "will forthwith issue." Sheriff Scott, upon being permitted to make a statement, sought to assume all responsibility for the statement made by Mrs. Morgan. He also stated, among other things, that the statement was made for the purpose of trying to make sure that the public knew what was going on; that he wanted the people to know that just because a boss man comes and "wishes time on them," they might get it, or vice versa; that the people should know that "one person would get one treatment, and another person would get another treatment." Addressing the sheriff, the judge stated:
Mrs. Morgan, I think she is one of the best employees and my friend; but I think that remark, even in recess, was totally out of line. I want it so recorded. Of course, there will be no contempt citation issued. But I will tell you this: If it had happened in open court, it would be a matter, a proper matter, of contempt. (emphasis supplied)[5]
Notwithstanding his indications to the contrary, on January 20, 1981, six days after the courtroom event, Judge Anderson issued citations for "direct criminal contempt" against both petitioners. Prior to the scheduled hearing on the citations, petitioners filed a motion requesting that the contempt hearing be heard by a judge other than Judge Anderson, which was denied.
At the evidentiary hearing, the bailiff testified that he was very near Mrs. Morgan at the time of her statement, that it was made in a "low pleasant voice,"[6] and that it was his impression that it was not the intention of Mrs. Morgan or Sheriff *231 Scott to convey any question as to Judge Anderson's integrity or any disrespect for Judge Anderson or the County Court. Testimony of a Game and Fresh Water Fish Commission officer to like effect was proffered by counsel in the witness's absence, and was accepted for the record by Judge Anderson. Mrs. Morgan testified that she did not intend to question the judge's integrity, communicate any disrespect, or in any way disrupt the courtroom proceedings, and that it was not her impression that the sheriff intended to convey to the judge any degree of disrespect or to disrupt the normal proceedings of the court. She further explained that Judge Anderson frequently asked her to relay to him sentences that he had previously given on similar offenses in other cases, and that it was normal procedure for her to provide him with such records. Sheriff Scott testified that it was not his intention to question Judge Anderson's integrity, to communicate any disrespect for the judge or the County Court, or to disrupt the courtroom proceedings in any way. He further stated that he was unaware of any disruption having actually taken place in the courtroom. At the conclusion of the testimony, the judge announced his inclination to mitigate any punishment that might be imposed if he received an apology for the contemptuous utterance and a retraction for the record. No apologies were forthcoming.
We will first dispose of the "free speech" argument. The cases relied upon by petitioners and amicus curiae (Florida Sheriffs Association) do not support their contention that rights of "free speech" under the First Amendment protect petitioners' conduct complained of here. Bridges v. California, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941), and Pennekamp v. Florida, 328 U.S. 331, 66 S.Ct. 1029, 90 L.Ed. 1295 (1945), both apply a "clear and present danger to judicial administration" standard in contempt proceedings involving publications or statements made out of the presence of the court. That this standard applies only to out of court statements was made clear in Wood v. Georgia, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962). In Wood, a Sheriff delivered to a grand jury a press release and a letter derogatory of the judge who had charged the grand jury to conduct an investigation concerning "Negro block voting." The court stated (370 U.S. at 383, 384, 82 S.Ct. at 1369, 1370):
While courts have continuously had the authority and power to maintain order in their courtrooms and to assure litigants of a fair trial, the exercise of that bare contempt power is not what is questioned in this case. Here it is asserted that the exercise of the contempt power, to commit a person to jail for an utterance out of the presence of the court, has abridged the accused's liberty of expression ... In Bridges v. California (cite omitted) this court . .. had occasion to review a State's exercise of the contempt power utilized to punish the publisher of an out-of-court statement ... . Thus clarifying the exercise of this judicial power in the context of the protections assured by the First Amendment, the Court held that out-of-court publications were to be governed by the clear and present danger standard. .. . (emphasis supplied)
It is obvious from the foregoing that the power of a court to punish for contempts occurring out of the presence of the court stands on a different footing than in-court contempts.
... courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect and decorum in their presence, and submission to their lawful mandates, .. .
Anderson v. Dunn, (1821) 6 Wheat. (U.S.) 204, 227, 5 L.Ed. 242, 247. Petitioner's conduct here was in-court, and is not governed by the rule pertaining to out of court contempt.
The conclusion that petitioner's conduct was directed against the authority and dignity of Judge Anderson, and that it was calculated to and did hinder, embarrass, delay and obstruct the judge in the performance of his duties, can reasonably be drawn from the statements and the circumstances *232 under which they were made. Judge Anderson's handling of court matters for the day was delayed, disrupted, and the judge, in his own words, was reduced to a state of "utter shock." When so viewed the conduct of petitioners was such that it could amount to "criminal contempt." See Ex Parte Earman, 85 Fla. 297, 95 So. 755 (1923); Ray v. State, 352 So.2d 110 (Fla. 1st DCA 1977). Of course, a vastly different question would be presented if the statement to the judge had been a mere spontaneous utterance, or one made at the invitation of the court or a party during the sentencing phase of a criminal proceeding, or even if the remarks had been somehow provoked or suggested by the conduct of the judge himself. No such circumstances appear in this record.
Petitioners' attempt to clothe the incident with legitimacy by invoking a "right" or "need to inform the public" is not convincing. This view has been endorsed by amicus curiae, a prestigious statewide association ostensibly reflecting the views of the highest law enforcement officers of Florida's sixty-seven counties. On this point we concur with the Circuit Court's opinion affirming the contempt judgment in which it is stated:
Although the First Amendment to the United States Constitution protects the contemnors' freedom of speech, there are limits to protected conduct. Sheriff Scott caused his employee, Lillian Morgan, to go into Court and "put on record" criticism of the Court's sentence in a matter that had been concluded. The record in Court proceedings documents the official business conducted there; it does not serve as a constitutional public message center for those who want to vent inflammatory criticism of Court action. There are permissable avenues for expression of criticism available to the contemnors. The official court record is not one of them.
Notwithstanding the above observations, we are unable to conclude that some other reasonable and detached judicial officer, viewing the matter in retrospect, and with due consideration of all the circumstances  including one pointed out by the judge himself, that "a calm dispassionate review of the record clearly indicates no realization on the part of the Contemnors of the enormity of their offense" (quoted from citation to show cause)  would not have determined the matter differently or imposed different punishments than did Judge Anderson.
As stated in Ex Parte Earman, 95 So. at 761:
... The criterion is not the influence the conduct or acts complained of may have had upon the mind of the particular judge, but the true test is the reasonable tendency of the conduct or the acts done to improperly influence or to embarrass or hamper the judicial action of a court... .
The rule is further stated in Ex Parte Biggers, 85 Fla. 322, 95 So. 763, 769 (1923):
A circuit judge is expected to be a man of ordinary firmness of character; and, if the matter complained of as constituting contempt, when fairly interpreted, does not have a reasonable tendency to degrade or to embarrass or hinder such a judge in performing his own duty, or to affect a mind of reasonable fortitude, it is not a criminal contempt for which imprisonment may be lawfully adjudicated, particularly when an intent to offend is denied on oath.
Generally it is the nature and reasonable tendencies of the matter complained of that controls; and, if the matter is of doubtful tendency or might or might not be considered ambiguous as to its general or specific purpose, the circumstances under which the thing was done or in which its consequences are to appear, may be considered in determining the reasonable tendency of the matter to affect judicial authority or dignity... .
More concisely stated, the "true test," said the court in Vines v. Vines, 357 So.2d 243 (Fla. 2nd DCA 1978), is whether the conduct interferes with or impugns the judicial function, not whether it "causes a particular judge to feel aggrieved or vexed." Id. at 246.
*233 Having the benefit of hindsight, which is always 20/20, we may venture the suggestion that the same conduct for which petitioners stand convicted might on other occasions and in other courtrooms have produced consequences no more serious than a stern reprimand or warning. In fact, the record of what did occur on this occasion brings our suggestion closer to reality, for as noted, Judge Anderson lost no time in issuing the admonition "I want no administrative assistance questioning my discretion or no sheriff." He further characterized the remarks as "out of line," and warned that "if it had happened in open court" it would be a matter of contempt. Thus, with admirable judicial restraint, the judge appropriately vindicated the affront to the dignity and authority of the court. He further exhibited, in our opinion, a sound and balanced judgment in the matter when he concluded that no contempt charges would be made. Unfortunately, as indicated, that was not the end of it.[7]
Nevertheless, it should be made clear that if the petition now before us rested solely on the premise that the statements were not contemptuous, or were somehow privileged, we would agree with the respondent, particularly in view of this court's limited review by way of certiorari, and would uphold the Circuit Court's affirmance of the contempt judgments. The issue, however, is not whether in our opinion a reasonable, detached and impartial judge would have entered the contempt judgment, or whether in our opinion the Circuit Court was correct in finding that the evidence would support a contempt judgment. The issue is one of due process, and it should be emphasized that the obviously guilty are entitled to it the same as the innocent. Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927). In this respect one man's "technicality" is another man's "justice."
The familiar axiom "a man should not be judge of his own case" is of ancient origin, but it has apparently not yet found its way into Florida law to the extent necessary to provide distinct guidelines for deciding under what circumstances a judge must disqualify himself to adjudicate direct criminal contempt charges involving disrespect or criticism directed to that judge. Since the question is ultimately one of federal constitutional import, we must turn to and be guided by the federal decisions. One of the landmark cases dealing with judge disqualification is Tumey v. State of Ohio, supra, in which the court applied the principle that judges are disqualified from acting in cases in which they have a direct interest in the outcome. The particular disqualifying interest in Tumey was pecuniary, the issue being whether a village judge was disqualified to preside over certain criminal offenses where the judge's compensation was derived, in part, from fines and costs exacted from those convicted in his court. In its holding of disqualification, the Supreme Court drew from common law precedents which established that in England, from earliest times, it was held that even the slightest pecuniary interest of any judge rendered his decision voidable. Significantly, among the precedents cited was In Hawkins, 2 Pleas of the Crown, Bk. 2, ch. 8, §§ 68, 69, from which the following quotation was taken (47 S.Ct. at 442):
The general rule of law certainly is that justices of the peace ought not to execute their office in their own case ... (citation omitted); and even in cases where such proceeding seems indispensably necessary, as in being publicly assaulted or personally abused, or their authority otherwise contemned while in the execution of their duty, yet if another justice be present, his assistance should be required to punish the offender ... (citation omitted). (Emphasis supplied)
Although the quotation from In Hawkins was used to demonstrate early recognition *234 by the English courts of the rule of disqualification for pecuniary interests, it is clear that the principle was also recognized as applying to contempt proceedings, as shown by a reading of the underlined portion of the above quoted paragraph.
Citing the early case of Cooke v. United States, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925), Mr. Justice Terrell, concurring in State v. Lewis, 80 So.2d 685 (Fla. 1955), discussed the subject in the following language (Id. at 694):
... The point was not raised by petitioner but it is evident from the rule nisi that the contempt charged amounted to a personal attack upon the integrity of the trial judge. When such a charge is so predicated, I think the better practice would be for the judge against whom it is lodged to follow the rule laid down by Chief Justice Taft in Cooke v. United States, ... (citation omitted)  retire from the case and let another judge be substituted to try and adjudicate the charge. It is very difficult for even the best of judges to act with becoming restraint when his integrity is brought in question.
Then under our system of jurisprudence no person, not even a judge should sit in judgment in his own case. While it is indispensable that the orderly administration of justice be protected at all times and at all hazards and the primary responsibility for doing so rests in the court, its exercise is so delicate that it should be exercised with extreme caution. When its exercise culminates in contempt for what amounts to an assault on the court, it is all the more important as admonished by Chief Justice Taft, that there be not the slightest element of reprisal, neither should the authority of the court suffer from too great leniency by leaning in the opposite direction. There may be cases in which it will not be practicable to substitute another judge, but when it is practicable and individual or public rights will not unduly suffer, the better part of wisdom would require that it be done. Human nature is so constituted that it would be most impossible for a judge to try a case involving a personal assault on his character without a show of resentment and all that such an impulse leads to. When there is this danger, he should not hesitate to request that another judge take his place... .
There is probably no better statement than Judge Terrell's in the Florida case and it is notable that his views coincide with those expressed in a case decided a year earlier, Offutt v. United States, 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11 (1954), and with In Re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955), decided almost contemporaneously with State v. Lewis, supra. The governing principles were also exceptionally well-stated by Mr. Justice Black in In Re Murchison, as follows (75 S.Ct. at 625):
A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This court has said, however, that `every procedure which would offer a possible temptation to the average man as a judge ... not to hold the balance nice, clear and true between the State and the accused denies the latter due process of law.' Tumey v. State of Ohio, ... (citation omitted). Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way `justice must satisfy the appearance of justice.' Offutt v. United States, .. . (citation omitted).
In both Offutt and Murchison, the trial judges were held disqualified to preside in contempt proceedings, in Murchison, because the contempt proceeding was before a trial judge who sat as the "judge-grand jury" before whom the alleged contempt *235 was committed, and in Offutt, because the trial judge who also sat in the contempt proceeding had become personally embroiled in "an intermittently continuous wrangle" with the trial attorney charged with contempt.
It is clear, however, that not every criticism of a judge's conduct requires his disqualification in subsequent contempt proceedings. Ungar v. Sarafite, 376 U.S. 575, 84 S.Ct. 841, 11 L.Ed.2d 921 (1964), is such a case. While affirming the rule that "there are criticisms of judicial conduct which are so personal and so probably productive of bias that the judge must disqualify himself to avoid being the judge in his own case ..." (84 S.Ct. at 846), and although the facts revealed strenuous objections by a witness (an attorney) to the orders of the court and to its conduct of the trial, culminating in a final outburst including an intemporate and strongly worded comment on the propriety of the court's ruling, the court nevertheless found no basis for disqualification of the trial judge, stating (84 S.Ct. at 847):
... But we are unwilling to bottom a constitutional rule of disqualification solely upon such disobedience to court orders and criticism of its rulings during the course of a trial. See Nilva v. United States, 352 U.S. 385, 77 S.Ct. 431, 1 L.Ed.2d 415. We cannot assume that judges are so irascible and sensitive that they cannot fairly and impartially deal with resistance to their authority or with highly charged arguments about the soundness of their decisions... . This was disruptive, recalcitrant and disagreeable commentary, but hardly an insulting attack upon the integrity of the judge carrying such potential for bias as to require disqualification.
Turning our attention away from this discussion of general principles to the more specific issue of their application, we note that the rule requiring disqualification is embodied in Florida's Rules of Criminal Procedure, adopted in 1967. Rule 3.840, setting out the procedure for prosecution of indirect criminal concepts, contains the following subparagraph:
(5) Disqualification of Judge. If the contempt charged involves disrespect to or criticism of a judge he shall disqualify himself from presiding at the hearing. Another judge shall be designated by the Chief Justice of the Supreme Court.
Rule 3.830, "Direct Criminal Contempt" provides that a criminal contempt may be punished summarily "if the court saw or heard the conduct constituting the contempt committed in the actual presence of the court." There is no language in Rule 3.830, such as that found in 3.840(5), requiring disqualification of the judge if the contempt involves disrespect to or criticism of the judge. Because of this omission respondent urges, and we think erroneously, that if the contempt charged fits into the category of "direct criminal contempt" to which Rule 3.830 is applicable there is no requirement of disqualification.[8]
Cassidy v. Cassidy, 181 So.2d 649 (Fla. 3rd DCA 1966), seems to support respondent's position. There a defendant was held in contempt for statements made during a hearing. On appeal, he contended, among other things, that he was entitled to a hearing before another judge. In rejecting that contention the court stated (181 So.2d at 650):
It has been pointed out that it is better for the judge who finds himself wronged to set the hearing upon the citation before another judge... . (citations omitted). However, we know of no rule which requires this practice ... . (citations omitted)
*236 Although the court's opinion refers to Offutt v. United States, supra, we are convinced that the court either misapprehended the import of that and other decisions or, under the peculiar facts of the case determined that no due process violation occurred.[9] The latter is very likely the case, since the court was careful to point out that at the time the contempt was committed, the trial judge "expressed his intention to hold the defendant in contempt and to impose a sentence of sixty days in the county jail." Thus, the contempt was dealt with immediately, although no final order was entered at that time, but was followed by a citation for a later hearing at which the six months sentence was imposed. In the discussion and argument of the present case both petitioners and respondent have overlooked this feature of Cassidy, which in our opinion makes Cassidy consistent with both prior and subsequent decisions on this question, and with Rule 3.830 adopted the year after Cassidy was decided. Cassidy, in our opinion, simply does not stand for the proposition that there is "no rule" requiring disqualification of the judge where a direct contempt involves disrespect to or criticism of the judge, and the contempt has not been summarily ruled upon by the judge at the time of commission. The rule of due process may very well require disqualification.
Regardless of whether our reading of Cassidy is correct, subsequent decisions have clearly shown that the issue involved here is not one of the existence or construction of a "rule." A case in point is Mayberry v. Pennsylvania, 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971), which involved contempts committed by a defendant in a criminal trial. The Supreme Court held that the trial judge "could, with propriety, have instantly acted, holding petitioner in contempt, ..." (91 S.Ct. at 504). However, since the judge did not act immediately, but waited until the sentencing phase at the conclusion of the trial, he was held disqualified to rule on the contempt charges. On this precise point the court stated (91 S.Ct. at 504):
... Where, however, he does not act the instant the contempt is committed, but waits until the end of the trial, on balance, it is generally wise where the marks of the unseemly conduct have left personal stings to ask a fellow judge to take his place... .
Mayberry's directive that it is "generally wise" to have another judge, considered alone, seems to imply the existence of an element of discretion which would be inconsistent with a hard and fast rule.[10] However, there can be no mistaking the consequences where a judge fails to heed this advice. In Mayberry, as well as other cases, the courts have ruled that disregard for the appearance of impartiality is a due process violation which voids a judgment of contempt. See Johnson v. Mississippi, 403 U.S. 212, 91 S.Ct. 1778, 29 L.Ed.2d 423 (1971); United States v. Combs, 390 F.2d 426 (6th Cir.1968); In Re Murchison, supra; Offutt *237 v. United States, supra; Tumey v. Ohio, supra.
In our view Rule 3.830, Florida Rules of Criminal Procedure, is in effect a codification of existing law which permits summary punishment for direct contempts, but the rule merely marks the limits of the summary contempt power; it does not provide a rule for the measurement of due process requirements where the exercise of summary contempt powers is not appropriate, or if appropriate, have not been invoked until after the exigency has passed. See generally, Committee Notes and Author's Comment to Rule 3.830, 34 West's FSA, pages 320, 322. The Author's Comment to the rule notes its similarity to Rule 42(a) of the Federal Rules of Criminal Procedure, and suggests reference to 3 Wright, Federal Practice and Procedure (West 1969) for analysis and construction of the federal counterpart. Section 713 of the latter text contains the following statement (3 Wright at 183):
If the contempt is personal to the judge, Rule 42(a) should not be used, and a hearing should be held before some other judge, unless there is a pressing demand that the contempt proceeding be heard and disposed of immediately.
In this case there was no pressing demand when the judge issued his contempt citation six days after the contemptuous conduct.
From the authorities discussed we reach the following conclusion: Once the occasion and necessity for the immediate use of summary contempt power under Rule 3.830 has passed, any attempt by the judge to later resurrect and invoke contempt powers under this rule will be subjected to scrutiny by a reviewing court to determine whether the due process right to an impartial judge has been offended.[11] The Circuit Court's determination that the matter of disqualification in such cases is "discretionary" on the part of the trial judge is therefore erroneous, and constitutes a departure from the essential requirements of law.
Since the Circuit Court applied an improper standard of review, we must further examine the facts to determine whether it can be said that the trial judge either did not represent the "impartial authority of the law," or gave the appearance that he did not.[12] Our holding on this issue does not reflect on the performance of the judge, but relates to a question of procedure. Cf. Mayberry, Chief Justice Burger concurring, 91 S.Ct. at 506.
That the remarks of Mrs. Morgan followed by the judge's courtroom confrontation with Sheriff Scott left a "personal sting" is amply demonstrated by the record.[13] *238 There is, initially, the judge's own description of his reaction of "utter shock." However, of even greater significance is the confrontation between the judge and Sheriff Scott in which Sheriff Scott continued to insist on his right to let the public "know what was going on," and "If I see something that I don't think is right, then I have a right to voice my opinion." The judge's attitude concerning the sheriff's remarks is revealed by the respondent's brief filed in this court. "He [Sheriff Scott] is neither repentant nor conciliatory. He is adamant that he has the absolute right to brazenly go on record before the judge, while the judge is sitting, and to charge him with unfairness in his official sentencing and to suggest that he was improperly influenced by another." In fact, it is clear from the record before us that it was the sheriff's appearance and remarks to the court that bore the greatest potential for insult, rather than the statement by Mrs. Morgan which is the only misconduct charged in the citation. Here we have Judge Anderson's own assessment of the effect of Sheriff Scott's courtroom statements:
He persisted with verbiage to the effect, `I want the public to know.' Even after I had said, `Well, I don't plan to issue a criminal contempt citation'  what gets me was the parting shot. `I think the public ought to know that one defendant gets one treatment, and one another in this Court.' That was the straw that broke the camel's back. (statement of Judge Anderson at contempt hearing, emphasis supplied)
The marks left by Sheriff Scott's statements are further evidenced by the choice of words used by Judge Anderson in the citation for contempt.[14] The citation (after stating the substance of Mrs. Morgan's statement) recites in part:
WHEREAS, in the context of the criteria defining and providing for the summary punishment of direct criminal contempt it is impossible to imagine the commission of a more classic act of direct criminal contempt than that consummated in the utterance of the above quoted statement in open court ... and
* * * * * *
WHEREAS, such an act of direct criminal contempt is an affront not only to this court but to the judiciary of the entire state and nation in that it is the equivalent of mutiny at sea, insubordination in battle, and insurrection against civil authority, and contributes to the erosion of respect for authority now prevalent in our land, and
WHEREAS, on reflection it is certain that such insolence and insubordination on the part of an officer and his subordinate who are sworn to uphold the laws of this state cannot be allowed to go uncensured or unpunished, and the minimum duty of this court under the circumstances *239 is to initiate and implement such censure or punishment in vindication of such direct insult which impliedly extends to all courts, ... (emphasis supplied)
The charge was made by petitioners in their motion to disqualify that during the interim between the time of the alleged contempt and the scheduled hearing, Judge Anderson and the petitioners "have become involved in a public controversy." No evidence in support of this charge was presented other than copies of six local and state newspaper articles. These articles do not bear out any untoward out-of-court conduct by either of the participants in this event, so to the extent that any "public controversy" occurred it resulted, by and large, from the media's reporting of the court proceedings, including the citation issued six days following the alleged offense. These publications do, however, attest to the degree of offense taken by the judge to the petitioners' remarks.[15] Furthermore, the newspapers liberally quoted not only the verbal in-court statements of the parties, but the hyperbolic language of the citation which likened the petitioners' conduct to "mutiny at sea, insubordination in battle... ."
When the entire sequence of events is viewed in the context of Judge Anderson's initial judgment that no contempt citation would be issued against either petitioner, the conclusion is inescapable that the six-day lapse before the citation issued had no "cooling off" effect, but the opposite, and since there is no evidence to otherwise justify the judge's reversal of attitude, the conclusion is likewise inescapable that there were "marked personal feelings" that left a "personal sting" (Mayberry, 91 S.Ct. at 504). The appearance of justice requires, under such circumstances, that the contempt convictions be set aside and be redetermined by another judge, after a hearing according to petitioners all the rights to which they are entitled under Rule 3.840, Florida Rules of Criminal Procedure.
The preceding discussion, in our opinion, amply supports the conclusion that the Circuit Court's decision affirming the contempt judgment should be set aside. There are, however, two additional aspects of this case which should be noted the first of which, in particular, strongly signals the need for reversal of the contempt judgment. The first of these additional matters deals with the findings upon which the county judge based the contempt judgment. The order of judgment and sentence is bottomed in part upon the finding (numbered paragraph one of the order):
1. That the "On View" experience of the court at the time of the contemning utterance overwhelms the rebuttal testimony of the contemnors, their bailiff, (which is essentially self-serving) and the proffer of the game warden in that the court experienced as a result of the contemning remark the utter dissolution of dignity, discipline, and decorum in the courtroom in that the court personally observed the expressions of shocked incredulity on the face of Mr. Green (whose disposition triggered the remark who was waiting to be taken to jail), and on the faces of the defendants waiting to appear, defendants waiting for Judge Cooksey, and court personnel present since the insolent, sarcastic contemning statement was made in a voice heavy with insolence which carried to every corner of the courtroom.
The record in this case contains no evidence that the offending statement was "made in a voice heavy with insolence which carried to every corner of the courtroom," other than the statements of the judge himself. As already noted, Mrs. Morgan's statement was not recorded when made (either electronically or stenographically), and the judge's characterization of the tone and *240 manner of delivery is directly controverted by all of the sworn witnesses at the contempt hearing. Krueger v. State, 351 So.2d 47 (Fla. 3rd DCA 1977), dealt with an attorney's rejoinder directed to the judge, "You are entitled to your opinion, your honor," in response to the trial judge's characterization of the attorney's motion as "frivolous" or "absurd." The trial judge's written order of contempt recited that the attorney's remark was "made in a rude and impertinent fashion" (351 So.2d at 49). The District Court of Appeal reversed the contempt conviction, noting that the law of Florida requires that the judgment of contempt contain a recital of the facts upon which it is based, and finding that the judgment of contempt was not "objectively supported by the court transcripts," and was thus "procedurally defective." Id. at 50. Otherwise stated, in Krueger, as in the case before us, there was no objective evidence of the manner in which the offending statement was delivered except that of the offended judge. Furthermore, here as in Krueger, the allegedly contemptuous statement was of "doubtful tendencies," and capable of differing interpretations, depending upon the circumstances, including the tone, manner and volume of its delivery, as well as other factors. The significance of these findings as the basis for the contempt conviction cannot be minimized. It is clear that the judge drew upon his own personal observation and knowledge, not subject to cross-examination, as further evidenced by his declaration that the court's "on view" experience "overwhelms" the contrary testimony given by and in behalf of the petitioners, the reference to the "utter dissolution of dignity, discipline, and decorum in the courtroom ...," and the "expressions of shocked incredulity on the face of Mr. Green... ." These observations are not "objectively supported" by the evidence in the case. The wording of the citation itself charging that the statements by Mrs. Morgan were "announced in a sarcastic loudly audible voice," bears mute testimony to the importance attached to these aspects of the offense.
The United States Supreme Court, in In Re Murchison, supra, reversed contempt convictions which were based, in part, upon the trial judge's own assessment of the contemnors' attitude and manner on the witness stand, which he declared was "insolent ... defiant ..." (75 S.Ct. at 626). This produced an anomalous situation, described by the court as follows (Id. at 626):
Thus the judge whom due process requires to be impartial in weighing the evidence presented before him, called on his own personal knowledge and impression of what had occurred in the grand jury room and his judgment was based in part on this impression, the accuracy of which could not be tested by adequate cross-examination.
The second additional aspect to be noted is that here the Circuit Court, although upholding the judgment of contempt, did not find support for the jail sentences of one week and three months meted out, respectively, to Mrs. Morgan and Sheriff Scott. The Circuit Court found the incarceration penalty to be "excessive" and modified the judgment by entirely deleting the incarceration penalty as to each petitioner. In Offutt v. United States, supra, a similar occurrence was involved in which the court of appeals reduced trial counsel's jail sentence of ten days to forty-eight hours because of provocation on the part of the trial judge, the same circumstance which had led the Court of Appeals to reverse the contempt conviction of the defendant being tried. As to this ruling by the Court of Appeals, the Supreme Court declared (75 S.Ct. at 14):
The fact that the Court of Appeals reduced the sentence from 10 days to 48 hours because the petitioner's conduct "cannot fairly be considered apart from that of the trial judge," is compelling proof that the latter failed to represent the impersonal authority of law. Plainly, the Court of Appeals thought that in the trial court's disposition of the misconduct of the petitioner there was an infusion of personal animosity.
*241 In the case before us the Circuit Court's elimination of the jail sentences as "excessive" further strengthens our conclusion that the trial judge "failed to represent the impersonal authority of law" in dealing with the petitioners.
The decision of the Circuit Court is quashed and the cause is remanded for entry of an order setting aside the contempt convictions and for further proceedings in accordance with this opinion.
MILLS and ROBERT P. SMITH, Jr., JJ., concur.
NOTES
[1] James H. Scott is Sheriff of Jefferson County; Lillian C. Morgan is an administrative assistant to the sheriff.
[2] The employer had appeared in court to inform the judge that as a result of Green's intoxication he had almost run the employer's vehicle, in which his wife and children were passengers, off the road.
[3] Mrs. Morgan's statement was not recorded when made, but was restated by the judge for the record shortly afterward in the presence of the sheriff and Mrs. Morgan.
[4] At the judge's request Mr. Cichon, editor of the local newspaper, was telephoned. The record is not clear as to exactly what message was given to Mr. Cichon. However, his presence in the courtroom shortly thereafter was acknowledged by the judge.
[5] At another point, after Judge Anderson indicated that his record was not a matter to be questioned "in open court," Mrs. Morgan countered, "We were in recess, Your Honor," whereupon the judge responded: "Yes, we were in recess, but that is still a direct assault. Anyway, that's one reason why I'm not considering issuing a contempt citation"
[6] The citation included the charge that the statement by Mrs. Morgan was "announced in a sarcastic loudly audible voice," and that "it is impossible to imagine the commission of a more classic act of direct criminal contempt than that consummated" in the utterance of the statement in open court.
[7] Although it has not been argued that Judge Anderson's initial announcement of "no contempt" disposed of the matter, it is entirely possible that a disinterested trial judge sitting in judgment on a citation later issued, and reviewing the entire record of what occurred would have concluded that this was an adjudication on the merits, barring any further charges for the same conduct.
[8] The same argument was made regarding the federal counterpart of Rule 3.830 (Rule 42(a), Federal Rules of Criminal Procedure) and was rejected by the court in United States v. Combs, 390 F.2d 426 (6th Cir.1968), dealing with lawyer contempt. The court acknowledged that while by the "literal language" of 42(a), a judge need not disqualify himself even though the charge involves disrespect or criticism of a judge, the decisions of the Supreme Court have "narrowed the scope" of summary disposition of contempt charges, and suggest the impropriety of a trial judge hearing the charges when the contempt is "entangled with the judge's personal feeling against the lawyer." 390 F.2d at 429.
[9] We do not know whether the offending statements reached the level of those requiring disqualification, as measured by the case law on the subject, since the opinion states only that the statements were made by a party to the proceeding, were directed to the judge, and were such as to "impugn the integrity of the judicial process." Cassidy, 181 So.2d at 650.
[10] The failure on the part of the court in Mayberry and other decisions to lay down categorical rules on the question probably accounts for the Circuit Court's conclusion, on appeal, that in evidentiary hearings on direct criminal contempt citations disqualification of the judge issuing the citation is "discretionary." However, the absence of categorical rules is understandable and partially explained in Mayberry: "Generalizations are difficult. Instant treatment of contempt where lawyers are involved may greatly prejudice their clients but it may be the only wise course where others are involved." (91 S.Ct. at 504) Further, in regard to courtroom disruption by an accused, "a fixed rule to fit every situation is not feasible." (Mayberry, Chief Justice Burger, concurring, 91 S.Ct. at 506) See also United States v. Wilson, 421 U.S. 309, 95 S.Ct. 1802, 44 L.Ed.2d 186 (1975), which counsels the use of Rule 42(a) (the federal rule providing for summary proceedings) in an ongoing trial; but "where time is not of the essence," Rule 42(b) (the federal rule for plenary proceedings) may be more appropriate. "We adhere to the principle that only `[T]he least possible power adequate to the end proposed' should be used in contempt cases." 95 S.Ct. at 1808.
[11] If a contempt is committed by a lawyer during trial, and the trial judge "believes the exigencies of the trial require that he defer judgment until its completion" (Sacher v. United States, 343 U.S. 1, 72 S.Ct. 451, 456, 96 L.Ed. 717), the trial judge may confidently anticipate that he will not be held disqualified even though the contempt invokes disrespect to or criticism of the judge. See Mayberry v. Pennsylvania, 91 S.Ct. at 504. Note, however, that the authority of Sacher appears to have been eroded by subsequent decisions, so that it should be regarded as controlling only on similar facts. Of particular interest is the fact that the views of Justices Black, Frankfurter and Douglass, all of whom strongly dissented in Sacher (1952), shortly thereafter prevailed in Offutt (1954) (Frankfurter), Murchison (1955) (Black), and still more recently in Mayberry (1971) (Douglass).

Compare Sandstrom v. State, 402 So.2d 461 (Fla. 4th DCA 1981), in which counsel's refusal to proceed in accordance with the trial judge's directions and orders required "instant and immediate punishment for contempt," which, said the court, "militates against disqualification." Id. at 464.
[12] The test for disqualification has been variously phrased. See Offutt v. United States, supra: Did the trial judge represent the "impersonal authority of law..."? (75 S.Ct. 11); In Re Murchison, supra: Did the procedure followed "offer a possible temptation ... not to hold the balance nice, clear, and true" (75 S.Ct. at 625) between the State and the accused?; Ungar v. Sarafite, supra: Was there "bias, or such a likelihood of bias or an appearance of bias ..."? (84 S.Ct. 849); Johnson v. Mississippi, supra: Did the judge become "so enmeshed" with matters involving the petitioners? (91 S.Ct. 1780); and Mayberry v. Pennsylvania, supra: Were there "marked personal feelings on both sides," or do the facts show that "the marks of unseemly conduct have left personal stings ..."? (91 S.Ct. 504).
[13] From the outset it appears that considerations beyond the Judge's need to maintain the decorum of the courtroom and preserve the dignity and authority of the court might have been allowed to exert some influence over his actions, or at least to give that appearance. The Judge's very first statement was addressed to "Mrs. Morgan and the Sheriff and the press." The editor of the local newspaper was telephoned, at the Judge's request, before the Judge commenced his courtroom confrontation with the petitioners. After petitioner Scott had been summoned back to the courtroom, and before the Judge began relating the substance of the alleged contempt that had just occurred, he acknowledged the presence of the newspaper editor. The Judge stated: "Mr. Cichon, I appreciate your being here. I didn't call you over here. I don't want any particular story on this. I just want it for the record. I think its an important statement by the court." (emphasis supplied) During his colloquy with petitioner Scott, in response to Sheriff Scott's statement "we were trying to make sure that the public did, indeed, know what was going on...," the Judge stated: "They certainly will know this. That's why I got Mr. Cichon ..." (emphasis supplied) A witness also testified that the Judge asked the Clerk of the Court to get his secretary. "She came up, and he asked her to call Mr. Cichon. He had a statement for the press."
[14] The citation refers to Rule 3.830 and recites the procedural requirements of that rule. The "citation" was in form and content a finding of contempt, leaving only the matters of adjudication of guilt and consideration of any evidence of "excusing or mitigating circumstances" at the scheduled hearing.
[15] The story received immediate front page coverage in the local newspaper, and additional prominent and front page coverage in the local and area newspapers following the issuance of the citation. The opening line of a local, page one newspaper story said: "Judge Charles Anderson, his face flushed with anger, Wednesday morning threatened a sheriff's department employee with a contempt citation... ." The article continued: "This led to an exchange between Anderson and Sheriff Scott." Further, "Anderson retorted ...," "Anderson shot back ...," referring to the confrontation between the Judge and the Sheriff.